220 F.3d 81 (2nd Cir. 2000)
 JOEL ROTHMAN, individually and on behalf of all others similarly situated; ISAAC AUGENSTEIN, on behalf of himself and all other similarly situated; RUEBEN ADVANI, individually and on behalf of all others similarly situated; WILLIAM KELLMAN, individually and on behalf of all other similarly situated; CATHY ANDERSON, on behalf of herself and all others similarly situated; PETER J. PROCE, individually and on behalf of all others similarly situated; JERRY HOEHNEN, individually and on behalf of all others similarly situated; BLAISE RODON, on behalf of himself and all other similarly situated; MOSHE MOSBACHER, on behalf of himself and all others similarly situated, Consolidated-Plaintiffs-Appellants,
CHANI HERZOG, individually and on behalf of all others similarly situated, Plaintiff-Appellant,
v.
ANDREW GREGOR, Consolidated-Defendant-Appellee,
GT INTERACTIVE SOFTWARE CORPORATION; RONALD CHAIMOWITZ; JOSEPH J. CAYRE; ARTHUR ANDERSEN, LLP, Defendants-Appellees.
 Docket No. 00-7005
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued June 8, 2000
Decided July 11, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Ira M. Press, New York, N.Y. (Jeffrey H. Squire, Andrea Bierstein, Kirby, McInerney & Squire, New York, N.Y.; Lionel Z. Glancy, Los Angeles, CA, on the brief) for plaintiffs-appellants.
 Michael S. Oberman, New York, N.Y. (Alan R. Friedman, Andrew J. Maloney, Kramer Levin Naftalis & Frankel, New York, N.Y., on the brief), for defendants-appellees GT Interactive Software, Ronald Chaimowitz, Joseph Cayre and Andrew Gregor.
 James J. Sabella, New York, N.Y. (James D. Zirin, Jennifer A. DeMarrais, Brown & Wood, New York, N.Y., on the brief), for defendant-appellee Arthur Andersen.
 Before: OAKES, NEWMAN, and STRAUB, Circuit Judges.
 JON O. NEWMAN, Circuit Judge.
 
 
 1
 This appeal concerns a securities fraud claim against a seller of computer software for misrepresenting its income by failing to expense royalty advances after it became clear that the capitalized value of these advances was significantly overstated. Joel Rothman, representing a plaintiff class, appeals from the December 6, 1999, judgment of the District Court of the Southern District of New York (David Edelstein, Judge), dismissing with prejudice plaintiffs' claims against Defendant-Appellees GT Interactive Software Corp. ("GT") and its officers, and Arthur Andersen LLP ("Anderson"). We conclude that the complaint meets the pleading requirements for a securities fraud action against GT and its officers. We also conclude that the District Court properly dismissed the claim against Andersen for failure to sufficiently plead scienter. We therefore affirm in part, reverse in part, and remand.
 
 Background
 
 2
 The Second Amended Complaint ("Complaint") alleges or incorporates the following facts. GT, a Delaware corporation headquartered in New York, publishes and merchandises interactive entertainment, educational, and consumer software. Defendant-Appellee Ronald Chaimowitz is president, chief executive officer, and a director of GT. Defendant-Appellee Joseph J. Cayre is chairman of the board of directors of GT. Defendant-Appellee Andrew Gregor is vice-president of finance and chief financial officer of GT. Defendant-Appellee Andersen, an international accounting and consulting firm, has been GT's outside auditor since some time prior to December 1995. Plaintiff-Appellants represent a class of persons who purchased GT securities from December 15, 1995, through December 12, 1997 (the "GT Class Period"), and from February 4, 1996, through December 12, 1997 (the "Andersen Class Period").
 
 
 3
 GT commenced its operations in 1993. During the GT Class Period, GT developed many software titles each year by contracting with small, independent software developers and underwriting their development costs in large part by paying them the royalty payments they expected to earn in advance of any sales. For "front-line" software titles, GT advanced on average $ 750,000 to $ 1 million in royalties per title and paid $ 4-5 million to well-known developers. In its agreements with some software developers, GT defined the term "front-line" as a "'computer program so technically and aesthetically advanced that it can be marketed and sold to end users in the price range for new releases in its class.'" GT claimed to have released five front-line titles in 1994, twenty-four in 1995, and 67 in 1996. Under generally accepted accounting principles ("GAAP") concerning royalty prepayments, all costs incurred to "'establish technological feasibility of a computer software product to be sold, leased or otherwise marketed are search and development costs,'" and therefore "should be charged to expenses when incurred." GT's accounting policy for royalty advances during the relevant period, however, provided:
 
 
 4
 Royalty advances represent the unamortized elements of prepayments to third party licensors of software products for the right to manufacture and/or distribute their products under various licensing agreements. Such advances are amortized to cost of goods sold in accordance with the individual agreements.
 
 
 5
 Date Capitalized
 Earnings SEC Filing Royalty
 Announced Date Advances Net Income
1996 
quarter 1 4/30/96 5/14/96 $ 21,280,000 $ 5,100,000
quarter 2 8/1/96 8/14/96 $ 29,577,000 $ 2,140,000
quarter 3 11/4/96 11/14/96 $ 57,357,000 $ 3,757,000
quarter 4 2/10/97 3/31/97 $ 69,202,000 $ 4,393,000
 
 
 6
 1997
quarter 1 5/5/97 5/15/97 $ 70,344,000 $ 4,554,000 
quarter 2 8/7/97 8/14/97 $ 83,591,000 $ 4,469,000
quarter 3 11/3/97 11/14/97 $ 87,542,000 $ 8,526,000
 
 
 7
 Future realization of royalty advances is assessed quarterly by management and charged to expense if it is not likely that the amounts will be recovered through sales of the related product.
 
 
 8
 The Complaint states that until January 1, 1998, GT accounted for most of the royalty advances as assets in its financial disclosure statements, even though, the Complaint continues, the "great majority" of software titles for which GT advanced royalties during the Class Period "either failed commercially or underperformed expectations in the marketplace." This was done, the Complaint alleges, in order to artificially inflate GT's reported earnings throughout the Class Period.
 
 
 9
 To support this general allegation, the Complaint states or incorporates by reference several categories of information and specific allegations, including the following.
 
 
 10
 (a) Financial Statements. The Complaint sets forth the following summary of GT's financial statements in its SEC filings:
 
 
 11
 GT spent $ 27.8 million on royalty advances in the first nine months of 1996, and $ 18.3 million in the first nine months of 1997.
 
 
 12
 (b) Sales. According to domestic sales figures for all of GT's software titles released during the GT Class Period, as reported by PC Data, a market research firm, 64 percent of GT's products realized less than $ 250,000 in sales during the two year period covering calender years 1996 and 1997. From 1995 through 1996, between 56 and sixty-seven percent of GT's titles realized less than $ 100,000 in sales. Most of GT's sales of a software product are realized during the first year that the product was commercially available. The Complaint provides the names and sales figures for several front-line titles releasedbetween November 1995 and March 1997 that GT allegedly failed to "write down to net realizable value on a timely basis."
 
 
 13
 According to GT's 1996 Form 10K, GT's annual net sales amounted to $ 234,461 in 1995 and to $ 365,490 in 1996. A September 13, 1997, report by an analyst at Oppenheimer & Co. calculated that, because of GT's operating and sales costs, GT needed to realize nearly $ 4 in sales to recoup every $ 1 of the royalties it prepaid.
 
 
 14
 (c) Stock Transactions. In December 1995, GT made an initial public offering ("IPO") of 10 million shares, including 5.5 million that the company offered and 4.5 million that the selling stockholders tendered, at $ 14 per share, from which it realized $ 71,885,000. GT's prospectus, dated December 14, 1995, reported that as of December 6, 1995, Defendant-Appellee Cayre beneficially owned 16,094,907 shares of GT common stock, and Defendant-Appellee Chaimowitz beneficially owned 804,582 shares of GT common stock. In connection with the IPO, Cayre sold 1,494,720 of those shares at $ 14 per share for approximately $ 20,000,000. During the Class Periods, Chaimowitz sold at least 70,000 of his shares for an aggregate value of $ 1,615,000. In February 1997, Chaimowitz purchased 6,000 shares of GT stock.
 
 
 15
 In June and July 1996, GT used its stock to acquire three companies: FormGen Corp. for 1,030,000 GT shares, Wizard Works Group for 2,350,000 GT shares, and Humongous Entertainment, Inc. for 3,458,000 GT shares. During October 1997, GT acquired SingleTrac Entertainment Tech for $ 5.4 million in cash and 700,000 shares of stock valued at $ 7.2 million, for a total value of $ 12.6 million.
 
 
 16
 (d) Lawsuits. On November 28, 1995, GT entered into an agreement with Scavenger, Inc. to develop four software games, and advanced $ 2.5 million in royalties to Scavenger. In September 1997, Scavenger filed a breach of contract suit in New York Supreme Court, claiming that GT had deliberately withheld further payments in December 1996 and, as a result, Scavenger had ceased business operations in January 1997. In what the Appellants refer to as GT's cross-complaint, GT claimed that Scavenger had breached the contract in 1996, and that GT subsequently terminated the agreement in March 1997, because Scavenger never delivered two of the games and the two games it did deliver did not satisfy the requirements of the agreement.
 
 
 17
 On December 4, 1997, GT filed suit against Smith Engineering, a software developer, for breach of contract. GT alleged that notwithstanding royalty advances from GT totaling $ 645,000 over two and a half years pursuant to an agreement to develop a PC software game, Smith had failed to deliver certain "deliverables" pursuant their agreement, including "an interactive demonstration, alpha and beta test versions and a final gold master disk of the Game."
 
 
 18
 GT also filed suit against Technology Marketing Partners, filed in the Southern District of New York under docket number 97 CIV 6461, in which GT attempted to collect $ 200,000 in royalty advances from a software developer which allegedly failed to perform under its development contract with GT.
 
 
 19
 (e) The Possibility of a Write-Off. On October 5, 1997, GT announced its proposed acquisition of MicroProse, a leading developer and publisher of interactive entertainment software for personal computers. On November 14, 1997, in its Form 10-Q filed with the SEC for the third quarter of 1997, GT stated the following as to the $ 87.5 million in royalty advances it had capitalized by that time:
 
 
 20
 In light of the acquisition of SingleTrac in October 1997 and the anticipated acquisition of MicroPose in December 1997, the Company is reviewing the status of these advances to determine the expected rate of return and whether, in view of the Company's evolving strategy of increasing its focus on internally developed product, certain of these third party products may be abandoned in favor of internally generated products or for other reasons. To the extent the Company determines as a result of this review that any product will not be supported or pursued, the Company expects to expense the applicable advance account in connection with the acquisition of MicroPose.
 
 
 21
 Several weeks later, on December 5, 1997, GT and MicroPose terminated the proposed merger.
 
 
 22
 Two newspaper articles, each dated December 9, 1997, reported on the failed merger. One article, in the San Francisco Chronicle, cited sources as saying that MicroPose "backed out" of the merger because "G.T. had warned in a recent SEC document that it may have to write off some of its $ 87.5 million in deferred royalties . . . as part of its acquisition of MicroPose," a prospect that elicited "some worry" among MicroPose shareholders that "the potential write-off would have reduced the value of G.T. shares." The other article, in the Wall Street Journal, cited a falling GT stock price as a reason for MicroPose's decision to abort the merger, and quoted an analyst who "speculated that another factor was the possibility that GT might take a write-off of $ 87.5 million in prepaid royalties to software developers, which might have pushed the stock down further and put the merger at greater risk."
 
 
 23
 On December 12, 1997, BancAmerica Robertson Stephens issued a report in which, according to the Complaint, it "downgraded GT because of, inter alia, possible accounting improprieties and the possible need to write off most, if not all, of the $ 87.5 million in royalty advances." The BancAmerica report explained that as GT shifted "its business model from externally to internally developed products," GT might "change its accounting policy and write off some portion of the $ 87.5 million of prepaid royalties now on the balance sheet." The report noted that the "confusion regarding this issue may put pressure on the stock until a decision is made and higher EPS are reported in 2H: 98." The report added, however, "We believe most of these advances will be recouped. The prepaid royalties on the balance sheet are net of the reserves GTIS takes against products that are never completed or delivered."
 
 
 24
 According to the Complaint, as a result of the foregoing reports, the investing public learned that GT's reported earnings were likely to have been artificially and materially inflated due to the Defendants' failure to account properly for, i.e., to expense, tens of millions of dollars of prepaid royalties. In response to the foregoing events, at the close of the Class Periods, GT's stock price fell more than 17 percent.
 
 
 25
 (f) Actual Write-Off. On January 7, 1998, the Plaintiffs filed the original complaint in this action, alleging that GT, Chaimowitz, Cayre, and Gregor violated section 10(b) of the Securities Exchange Act, 15 U.S.C. 78j(b) (1994), and SEC Rule 10b-5, 17 C.F.R. 240.10b-5 (1999). The Plaintiffs also asserted derivative liability for Chaimowitz, Cayre, and Gregor under section 20(a) of the Act, 15 U.S.C. 78t(a).
 
 
 26
 A month later, on February 17, 1998, in a press release, GT announced that it had written off, for the fourth quarter of 1997, $ 73.8 million in royalty advances for products currently in development or on sale. The press release explained that certain market changes "have made it increasingly difficult to evaluate the likelihood of individual product acceptance and success," and stated that it would henceforth expense royalty advances as incurred until technological feasibility was confirmed. The writedown represented more than 80 percent of GT's previously capitalized royalty advances, and was more than ten times GT's average reported quarterly earnings during the GT Class Period. The writedown caused GT to report a loss of $ 25 million for fiscal 1997.
 
 
 27
 The Plaintiffs filed a Consolidated and Amended Class Action Complaint on January 7, 1999. The Second Amended Complaint, filed on February 5, 1999, named Defendant-Appellee Andersen as an additional defendant and alleged that Andersen also violated section 10(b) of the Securities Exchange Act, 15 U.S.C. 78j(b), and SEC Rule 10b-5, 17 C.F.R. 240.10b-5.
 
 
 28
 Andersen audited GT's financial statements for the years ended December 31, 1995 and 1996--the first two annual financial statements issued by GT following its IPO. Andersen issued opinions on these financial statements [to the market] in GT's 1995 and 1996 Forms 10-K as well as in GT's IPO prospectus. For the relevant time period, Andersen reviewed GT's filings with the SEC and the minutes of all of GT's Board of Directors and all committees thereof. Andersen's opinions stated in pertinent part
 
 
 29
 that (i) GT's financial statements "present fairly, in all material respects, the financial position of GT" and "the results of [its] operations and their cash flows" for the years ended December 31, 1994, 1995, and 1996; GT's financial statements were presented "in conformity with generally accepted accounting principles"; and that (ii) Andersen performed its audits of GT's financial statements "in accordance with generally accepted auditing standards [("GAAS")]."
 
 
 30
 The Complaint alleged that these representations were materially false because Andersen knew that the financial statements did not fairly present GT's financial position and did not conform to GAAP because "GT failed to and Andersen failed to require GT" to expense royalty advances for technologically unfeasible products and products whose poor sales made recoupment of those advances unlikely.
 
 
 31
 The Complaint further alleged that Andersen's representations that it audited GT "in accordance with GAAS were knowingly or recklessly false or misleading in that" Andersen had not determined the technological feasibility of GT's capitalized royalty advances, or that Andersen "knew or in the absence of recklessness should have known that most of the software products that GT marketed during the Class Periods achieved levels of sales that were so low and disappointing as to make recoupment of royalties advanced for such products highly unlikely."
 
 
 32
 The District Court dismissed the Amended Complaint in its entirety for failure to state a claim. See Herzog v. GT Interactive Software Corp., No. 98 Civ. 0085(DNE), 1999 WL 1072500 (S.D.N.Y. Nov. 29, 1999). The District Court dismissed the claims against GT and its officers for failing to allege sufficient facts to plead false or misleading representations, scienter, and loss causation. See id. at *6-10. The Court also dismissed the claim against Andersen because it was "based on the same underlying factual allegations" as the claim against the other defendants. Id. at *11. Alternatively, the court ruled that the appellants "offer no evidence" to support Andersen's scienter. Id. Finally, the Court found Appellants' claim against Andersen to be time-barred under section 9(e) of the Securities Exchange Act, 15 U.S.C. 78i(e). See id. at *12. Judgment was entered on December 6, 1999.
 
 Discussion
 
 33
 We review de novo a district court's dismissal of a complaint under Fed. R. Civ. P. 12(b)(6). See Stuto v. Fleishman, 164 F.3d 820, 824 (2d Cir. 1999). For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, see Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989), as well as public disclosure documents required by law to be, and that have been, filed with the SEC, see Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991), and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit, see Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991).
 
 
 34
 To state a cause of action for securities fraud under section 10(b), 15 U.S.C. 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5(b), "'a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury.'" Chill v. General Electric Co., 101 F.3d 263, 266 (2d Cir. 1996) (alteration in original).
 
 I. Claims Against GT and Its Officers
 A. Misleading Omission
 
 35
 The Appellants contend that GT and its officers rendered its reported earnings and its accounting policy regarding royalty advances misleading by omitting the fact that they refused to expense royalty advances for a particular software title even after concluding that royalty advances for that title were unlikely to be recouped by future sales of the title. The Appellants argue that GT's failure to expense was so perverse that the royalty advances for the most poorly selling titles were the ones that remained capitalized. "GT only expensed advances when such amounts could be charged against sales of the software title. If a title did not generate sufficient sales, the royalty advances remained in the asset column and were not expensed." Brief for Appellants at 9 (citations omitted).
 
 
 36
 To survive a motion to dismiss, Appellants' complaint must "state with particularity all facts on which" they formed this belief. 15 U.S.C. 78u-4(b)(1). Using GT's public financial statements, the Appellants sufficiently allege facts supporting the inference that GT did not expense any prior royalty advances during the first nine months of 1996 and the first nine months of 1997. According to GT's Form 10-K for the fiscal year ended December 31, 1996, GT recorded as assets royalty advances in the amount of $ 29,577,000, as of December 31, 1995. According to the Complaint, by the third quarter of 1996, GT had capitalized $ 57,357,000 in royalty advances. The Appellants argue that GT did not expense any prior royalty advances during the first nine months of 1996; this is an inference from the fact that the increase in the total amount of royalty advances treated as assets by the end of that period ($ 27,780,000) equaled the amount GT spent on royalty advances during that period ($ 27.8 million). If some of the previously capitalized royalties had been expensed, the increase in the total of capitalized royalties should have been somewhat less than the amount of newly advanced royalties.
 
 
 37
 Similarly, according to GT's Form 10-Q for the quarter ending on September 30, 1997, GT had recorded $ 69,202,000 in total royalty advances as assets as of December 31, 1996, and had recorded $ 87,542,000 in total royalty advances as assets as of September 30, 1997. According to the same Form 10-Q, however, during the first nine months of 1997, GT spent $ 18.3 million for royalty advances. The Appellants argue that GT did not expense any prior royalty advances during the first nine months of 1997, because the increase in the amount of total royalty advances treated as assets by the end of that period ($ 18,340,000) equaled the amount GT spent on royalty advances during that period ($ 18.3 million).
 
 
 38
 However, the Appellants must also sufficiently allege facts to support their belief that GT and its officers failed to expense royalty advances after concluding that they would be not be recouped through future sales. The Appellants base this belief on: (1) poor sales of most of GT's software titles during the GT Class Period, in comparison with the amount of royalties advanced; (2) GT's allegations in lawsuits seeking to recover royalty advances from particular software developers for failing to deliver technologically or commercially viable products; and (3) GT's $ 73.8 million write-off for the fourth quarter of 1997. This aspect of the Appellant's claim essentially combines the misrepresentation and scienter inquiries. In this respect, if the Appellants have sufficiently pled facts to support scienter, they have also met the pleading requirements for false representation or omission.
 
 B. Scienter
 
 39
 For a securities fraud claim, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. 78u-4(b)(2). By enacting this pleading requirement, Congress "did not change the basic pleading standard for scienter in this circuit (except by the addition of the words 'with particularity')." Novak v. Kasaks, 216 F.3d 300, 310, (2d Cir. 2000). We have held that to plead scienter in a securities fraud claim, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud. See Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999); Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). As Novak explains, what is required when endeavoring to plead facts supporting a strong inference of scienter by showing motive and opportunity is not a bare invocation of "magic words such as 'motive and opportunity'" but an allegation of facts showing the type of particular circumstances that our case law has recognized will render motive and opportunity probative of a strong inference of scienter. Novak, 216 F.3d at 311, 2000 WL 796300, at *10.
 
 
 40
 (1) Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness
 
 
 41
 To qualify as reckless conduct, the decision not to expense royalty advances must have been "highly unreasonable," representing "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978) (internal quotation marks omitted). The Appellants contend that they pled facts constituting strong circumstantial evidence of GT's intentional or reckless failure to expense royalty advances unlikely to be recouped through future sales, i.e., (1) poor sales of most of GT's software titles during the GT Class Period, (2) pleadings filed in GT's lawsuits against software developers indicating that certain software titles were not commercially viable, and (3) the $ 73.8 million write-off of royalty advances that GT took for the fourth quarter of 1997.
 
 
 42
 First, the Appellants argue that GT acted recklessly by not expensing royalty advances for poorly selling software titles. Generally, poor business judgment is not actionable under section 10(b) and Rule 10b-5. See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 479, 51 L. Ed. 2d 480, 97 S. Ct. 1292 (1977). The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness: "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." Shields, 25 F.3d at 1129.
 
 
 43
 The Appellants' argument, however, turns not on GT's overly optimistic predictions of sales before the fact, but on its failure to expense royalty advances after poor sales during the Class Periods were known. In Novak, we upheld the sufficiency of a complaint alleging that a company's refusal to mark down inventory known to be worthless artificially inflated the company's reported financial results and rendered the company's markdown policy misleading "in that the disclosed policy no longer reflected actual practice." Novak, 216 F.3d at 311. The facts of the pending claim are not quite as strong as in Novak, but present somewhat similar allegations of a reckless failure to follow an announced policy of expensing royalty advances, thereby artificially inflating financial results.
 
 
 44
 We assume to be true, as we must on a motion to dismiss, the allegation that most of GT's sales of a software product are realized during the first year of that product's release, and that GT knew of this fact. Although the Appellants do not have to fix the exact date and time that GT and its officers became aware that recovering royalty payments through future sales would be unlikely, they "must supply some factual basis for the allegation that the defendants had reached this conclusion at some point during the time period alleged." Posner v. Coopers & Lybrand, 92 F.R.D. 765, 769 (S.D.N.Y. 1981) (dismissing for insufficient pleading a securities fraud action alleging that between 1972 and 1975 defendants become aware that company's product was not economically viable), aff'd, 697 F.2d 296 (2d Cir. 1982) (table); see Ross v. A.H. Robins Co., 607 F.2d 545, 558 (2d Cir. 1979) (Fed. R. Civ. P. 9(b) required plaintiff's pleading to allege facts concerning when defendants knew about their product's major safety problems). In this case, GT and its officers do not dispute that they assessed quarterly the probability that they would recoup royalty advances for a particular software title through future sales. Therefore, allowing for awaiting a full year of sales after a product's release in late 1995, GT's refusal to expense royalty advances could rise to the level of recklessness sometime after the beginning of the first quarter of 1997.
 
 
 45
 Secondly, the Appellants point to the pleadings in separate lawsuits filed by GT against Scavenger, Smith Engineering, and Technology Marketing Partners. The Appellants argue that GT failed to expense royalty advances to these software developers even though, according to GT's lawsuit pleadings, these software developers had failed to perform their obligations under their development agreements with GT. The Appellants conclude that GT's pleadings in these lawsuits indicate that GT did not consider the software titles at issue to be commercially viable.
 
 
 46
 Notably, GT does not dispute that it failed to expense the royalty advances to Scavenger, Smith, and Technology Marketing Partners during the Class Periods. Instead, GT argues that these facts do not support a strong inference of fraudulent intent, because it would not have been appropriate to expense the royalty advances sought to be recovered through these lawsuits unless it became apparent that GT would not be able to do so. This argument, however, appears to concede the Appellants' point: GT sued to recover royalty payments, because it had concluded that for these software titles it could not recover its royalty advances through sales of the related product. According to GT's accounting policy, that conclusion required expensing the unrecoverable royalties (subject perhaps to a footnote indicating the possibility of a non-recurring income item in the future if the lawsuit succeeded in recouping the advanced royalties). GT advanced approximately $ 3.4 million in royalties to Smith, Technology Marketing, and Scavenger alone.
 
 
 47
 The Appellants also ask this Court to take judicial notice of a breach of contract suit filed in January 1999 in New York Supreme Court by GT against Midway Games Inc. and other co-defendants. In its complaint against Midway, GT alleges that, starting in 1994, GT advanced $ 35 million in royalties to the defendant software developers. Midway and the other defendants, however, failed to satisfy their contractual obligations, including failing to deliver "technically acceptable, 'bug'-free master game disks" and advertising materials.
 
 
 48
 The Appellants explain that the Second Amended Complaint does not refer to the Midway lawsuit because the Midway complaint was filed after the Appellants had submitted their proposed second amended complaint in the instant action in connection with their January 22, 1999, application to amend the complaint and name Andersen as a defendant. The Appellants submitted a copy of the Midway complaint to the District Court in their papers in opposition to the motion to dismiss. GT and its officers do not dispute the authenticity of the Midway complaint and further agree that the Midway complaint was filed on or after January 22, 1999. Pursuant to Fed. R. Evid. 201(b), we take judicial notice of the Midway complaint as a public record. See, e.g., 5-Star Management, Inc. v. Rogers, 940 F. Supp. 512, 518 (E.D.N.Y. 1996) (taking judicial notice of pleadings in other lawsuits attached to defendants' motion to dismiss).
 
 
 49
 GT and its officers argue that the Midway complaint is not relevant because it was filed thirteen months after the GT Class Period ended and eleven months after GT announced its change in accounting policy. The allegations in the Midway complaint, however, refer to the failure of software developers to meet their contractual obligations during the Class Periods. For example, the Midway complaint alleges that sometime after 1994, the Midway Group failed to deliver "technically acceptable master disks for at least thirty games on a timely basis," causing "material delays" in GT's "exploitation of the games," and resulting in substantial financial losses. Although the Midway complaint does not specify when this alleged breach of contract occurred, it is reasonable to draw the inference favorable to the Appellants that some aspect of it occurred during the GT Class Periods. Together, in the four lawsuits, GT sought to recover approximately $ 38.4 million in royalty advances, or almost 44 percent of the $ 87.5 million in royalty advances that GT had capitalized by the third quarter of 1997.
 
 
 50
 Finally, we deem significant the amount of the write-off GT eventually did take for the final quarter of 1997. In its February 17, 1998, press release, GT stated that it had written off, in the fourth quarter of 1997, $ 73.8 million in royalty advances for products currently in development or on sale, because the increase in technological change, competitiveness for shelf space, and buyer selectivity, coupled with a shorter product life cycle, had made it increasingly difficult to evaluate the likelihood that an individual product would succeed. GT further stated that it had decided to change its accounting policy and "prospectively expense royalty advances in a manner comparable with internal software development costs, which are expensed as incurred, until technological feasibility is confirmed." The Appellants argue that GT's $ 73.8 million write-off supports its claim of fraudulent intent. They argue that the magnitude of this write-off renders less credible the proposition that during the Class Period, GT believed it likely that it could recover those royalty advances through future sales. We agree. The write-off suggests something remarkable: prior to the fourth quarter of 1997, GT was unable to appreciate that the poor performance of its products after a disappointing first year sales required substantial expensing of royalty advances each quarter but suddenly realized that $ 73.8 million of $ 87.5 million in royalty advances, i.e., over 84 percent of the total royalty advances it had capitalized by the end of the third quarter of 1997 needed to be expensed. Taken together with the allegations of poor sales and the pleadings in various lawsuits filed by GT, the Appellants have alleged sufficient facts to support a strong inference of recklessness.
 
 
 51
 (2) Motive and Opportunity.
 
 
 52
 (a)Acquisitions. The Appellants also seek to plead facts supporting a strong inference of scienter by alleging facts to show motive and opportunity. It is undisputed that Defendants-Appellees GT, Chaimowitz, Cayre, and Gregor had the opportunity to commit fraud. The key question is motive, namely whether the Appellants adequately alleged "concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged." Shields, 25 F.3d at 1130. The motive alleged must be sufficiently particularized. See, e.g., Chill, 101 F.3d at 268 (generalized motive to justify investment and have it appear profitable, "one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter") (footnote omitted); San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 814 (2d Cir. 1996) (company's desire to maintain high bond or credit rating, and thereby maximize marketability of and minimize interest rate on debt securities, does not qualify as sufficient motive for fraud); Acito v. Imcera Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (scienter cannot be adequately pleaded based only on existence of executive compensation dependent upon stock value).
 
 
 53
 The Appellants argue that GT, Chaimowitz, Cayre, and Gregor had the requisite motive because they would concretely benefit from an artificially inflated GT stock price, caused by their alleged material omissions, by using less GT stock as consideration to acquire four companies: two in June 1996, another in July 1996, and another in October 1997. This Court has ruled that, in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter. See In re Time Warner Inc. Securities Litigation, 9 F.3d 259, 270 (2d Cir. 1993) (sufficient pleading of motive that company allowed prior statements to become misleading by material nondisclosure of company's active consideration of rights offering in order to maintain high stock price before announcing new rights offering in order to lessen dilutive effect of that announcement on stock price); cf. Sirota v. Solitron Devices, Inc., 673 F.2d 566, 573 & n.2 (2d Cir. 1982) (sufficient evidence to support jury finding of defendants' fraudulent intent to overstate inventory, including, among other evidence, that company benefitted from overstated inventory because stock price followed rising reported earnings, "enabling [the company] to make numerous acquisitions after a five-for-one split") (footnote omitted).
 
 
 54
 San Leandro does not support the argument advanced by GT that the desire to consummate any corporate transaction cannot ever be a motive for securities fraud. In San Leandro, we simply ruled that a company's desire to maintain a high bond or credit rating, and thereby maximize the marketability of, and minimize the interest rate on, debt securities, does not qualify as a sufficient motive for fraud "because 'if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" 75 F.3d at 814 (alteration in original). Although virtually every company may have the desire to maintain a high bond or credit rating, as San Leandro reasoned, not every company has the desire to use its stock to acquire another company.
 
 
 55
 GT's acquisitions that occurred in 1996, however, cannot support motive to commit fraud, because in mid-1996, the allegedly poor selling products had either not then been introduced or had not been on sale long enough to reveal the need to expense advanced royalties. The Complaint alleges sales data for software released in late 1995 at the earliest. The Appellants further alleged that most of GT's sales of a software product were realized during the first year it was commercially available. Therefore, under the Appellants' theory, GT was entitled to wait at least a year, until late 1996, to become aware that the sales of products released in late 1995 would not recoup the royalty advances for that product.
 
 
 56
 Accordingly, only GT's October 1997 acquisition of SingleTrac Entertainment Tech could support a motive to commit fraud and thereby contribute to a finding of scienter. At oral argument, counsel for GT argued that this acquisition alone could not support a strong inference of fraudulent intent (based on maintenance of a high share price) because the acquisition was largely a cash deal. The Complaint, however, states that GT acquired SingleTrac for $ 5.4 million in cash and 700,000 shares of stock valued at $ 7.2 million. Based on this allegation, it is strongly inferable that GT and its officers improperly refused to expense royalty advances in order to artificially inflate its stock price with an eye toward using its stock to acquire SingleTrac. This conduct, in combination with the other allegations of the Complaint, reenforces the adequacy of the complaint's allegation of scienter. Whether sufficient motive could be shown solely by an allegation of a high stock price artificially maintained in the context one impending acquisition might well depend on the particular circumstances of the case, and, in any event, is not the issue before us.
 
 
 57
 (b) Insider Sales. The Appellants also allege that Cayre and Chaimowitz had a motive to inflate GT's stock price because they sold many shares of GT stock to their financial benefit. We have recognized that "unusual insider trading activity during the class period may permit an inference of bad faith and scienter." Acito, 47 F.3d at 54. In connection with GT's IPO, Cayre sold 1,494,720 shares of the 16,094,07 shares he beneficially owned at the time for $ 20 million. Chaimowitz beneficially owned 804,582 shares at the time of the IPO, and allegedly sold at least 70,000 shares during the Class Periods for $ 1,615,000.
 
 
 58
 The District Court did not consider these sales to be unusual, however, because Cayre sold only approximately 9.3 percent of the stock he beneficially owned in December 1995, and because Chaimowitz's sales involved only 9.9 percent of the shares he owned outright and 7.8 percent of the total shares and stock options he held at the time of sale. See Herzog, 1999 WL 1072500, at *8. The District Court also noted that in February 1997, Chaimowitz bought 6,000 shares and held those shares through the end of the Class Period: "Taking into account Defendant Chaimowitz's vested options, he held more shares at the end of the GT Class Period than at the beginning." Id.
 
 
 59
 The Appellants argue that the District Court erred by focusing on the percentage of stockholdings sold, not on the considerable dollar amounts received by Cayre and Chaimowitz for selling their shares. Insider sales have been found unusual based on a variety of factors, including the amount of profit from sales, see In re Oxford Health Plans, Inc. Securities Litigation, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ($ 78 million profit from sale of 1.2 million shares during the class period is "massive by any measure"), and the portion of stockholdings sold, see Stevelman, 174 F.3d at 85 (president and CEO of company sold 40 percent of his stock holdings in company while making optimistic statements about company's financial position), the change in volume of insider sales, see In re Quintel Entertainment Inc. Securities Litigation, 72 F. Supp. 2d 283, 296 (S.D.N.Y. 1999) (sales by corporate insiders represented 156 percent increase over total insider sales for fourteen months prior to start of class period), and the number of insiders selling, see San Leandro, 75 F.3d at 814 (company officer's $ 2 million profit from company stock sales did not suffice to prove motive, because no other company executives sold their shares during the relevant period).
 
 
 60
 In light of the $ 2 million profit in San Leandro, which in that case was not by itself enough to establish the sales as unusual, Chaimowitz's alleged $ 1.6 million profit is not unusual even if we look only to the absolute amount of profit, and certainly not if we consider the fact that Chaimowitz sold only 9.9 percent of his GT stock during the class period, see Acito, 47 F.3d at 54 (insufficient facts to support inference of scienter where only one corporateinsider sold 11 percent of his stock in the company).
 
 
 61
 Although Cayre's sales in December 1995 resulted in a $ 20 million return, a more significant amount, several circumstances surrounding his sales weaken the inference of fraudulent intent. First, it is undisputed that his sales in connection with the IPO represented only about 9.3 percent of the GT stock he beneficially owned. See In re Oxford, 187 F.R.D. at 140 ("Large volume trades may be suspicious but where a corporate insider sells only a small fraction of his or her shares in the corporation, the inference of scienter is weakened. "). Second, as with the 1996 acquisitions, Cayre's 1995 sales do not support motive, because he was entitled to wait at least a year, until early 1997, to become aware that the sales of products released in late 1995 would not recoup the royalty advances for those products. See Acito, 47 F.3d at 54 (sales by outside director occurring before alleged misrepresentation or omission "fail to provide an inference of an intent to deceive the public").
 
 C. Causation
 
 62
 In a securities fraud action, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. 78u-4(b)(4). To establish causation, a plaintiff must prove "that the economic harm that it suffered occurred as a result of the alleged misrepresentations" and that "the damage suffered was a foreseeable consequence of the misrepresentation." Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992) (citation omitted).
 
 
 63
 The District Court rejected the sufficiency of the claim of loss causation because of the absence of a suggestion that GT's practice of capitalizing royalty advances caused the drop in GT's stock price, and because GT fully disclosed its accounting policy. Neither reason defeats the claim of loss causation. The Appellants allege that the stock price fell, not because the royalty advances were initially capitalized, but because the market became aware of an impending writedown attributable to GT's reckless failure to expense appropriate portions of the advances, once it became evident that they would not be recouped through sales. And, although the accounting policy was disclosed, the Appellants' claim is that it was not followed, with a consequent overstatement of income and a decline in share price when the market became aware that a massive writedown was imminent.
 
 
 64
 The Appellants focus on the December 9 newspaper articles on the failed merger with MicroPose and the December 12 report issued by BancAmerica as the causes of the drop in GT's stock price. The Appellees respond that GT had already announced in its November 1997 Form 10-Q that it might expense some or all of its $ 87.5 million in royalty advances. Although the precise duration of the GT class period and the amount of recoverable damages might ultimately turn on the extent and timing of the market's awareness of GT's impending writedown of royalty advances, the Complaint adequately alleges that awareness of such a likely writedown was a cause of the decline in share price. Of course, to show loss causation, the Appellants will have to show that but for GT's failure to expense royalty advances for a title even after concluding that they would not be recouped through future sales of that title, GT would never have had $ 87.5 million in royalty advances to potentially write off all at once. If the Appellants can prove this, they can also prove that GT could reasonably foresee that its fraudulent failure to expense would lead to a drop in GT's stock price whenever the market became aware of the impending writedown, because GT's quarterly earnings might well have been quarterly losses had GT expensed more royalty advances than it did during the Class Periods. We think the Complaint permits the required showing to be made.
 
 II. Andersen
 A. Time-Bar
 
 65
 The Appellants challenge the District Court's finding that the claim against Andersen is time-barred. To be timely, Andersen's claim under section 10(b) and Rule 10b-5 must have been "brought within one year after the discovery of the facts constituting the violation and within three years after such violation," 15 U.S.C. 78i(e). See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 & n.9, 115 L. Ed. 2d 321, 111 S. Ct. 2773 (1991); Ceres Partners v. GEL Associates, 918 F.2d 349 (2d Cir. 1990). "The 1-year period, by its terms, begins after discovery of the facts constituting the violation, making [equitable] tolling unnecessary." Lampf, 501 U.S. at 363. Discovery of facts for the purposes of this statute of limitations "includes constructive or inquiry notice, as well as actual notice." Menowitz v. Brown, 991 F.2d 36, 41-42 (2d Cir. 1993); see Dodds v. Cigna Securities, Inc., 12 F.3d 346, 353 (2d Cir. 1993).
 
 
 66
 "When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." Northwestern National Insurance Co. v. Alberts, 769 F. Supp. 498, 510 (S.D.N.Y. 1991) (citing Derdiarian v. Futterman Corp., 36 F.R.D. 192, 194 (S.D.N.Y. 1964)). The Appellants contend that they sought leave to amend the complaint to add Andersen as a defendant on January 22, 1999. See Brief for Appellants at 57.
 
 
 67
 The District Court, however, found that by December 12, 1997, the Appellants were already "on notice . . . of all the key facts on which they ultimately based their claim against Defendant Andersen in the Second Amended Complaint, more than a year later." Herzog, 1999 WL 1072500, at *12. Since the Appellants obviously had actual notice of the facts they alleged in the Original Complaint, the Court reasoned, "to the extent that Plaintiffs properly filed the original complaint against Defendant GT, Plaintiffs could have, based on the same information known to them at the time, brought an action against Defendant Andersen." Id.
 
 
 68
 We disagree. Missing from the Original Complaint are two subsequently pled allegations important to the Appellants' claim against GT: (1) the PC Data reports on GT's sales, and (2) the allegation that most of GT's sales of a given software product were realized during the first year of that product's commercial release. The Appellants argue that they could not sufficiently plead Andersen's scienter until they uncovered these alleged facts in December 1998, because an auditor has more limited access to information than a company has, and because Andersen reviewed GT's finances only annually, not quarterly. Without these alleged facts, we would not have found that the Appellants alleged sufficient facts to plead GT's scienter, let alone Andersen's scienter. Therefore, the facts in the Original Complaint could not have constituted actual notice of Andersen's alleged fraud.
 
 
 69
 However, we must consider whether the Appellants' claim against Andersen is time-barred because they had inquiry notice of Andersen's fraud over a year before they sought to name Andersen as a defendant. In Dodds, we explained, "When the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." 12 F.3d at 350. Although the facts alleged in the Original Complaint did not put the Appellants on actual notice as to the facts constituting Andersen's alleged fraud, they certainly obliged the Appellants to inquire into Andersen's role in the accounting improprieties that the Appellants began to suspect in December 1997.
 
 
 70
 We must further determine, however, when knowledge of the facts constituting the violation of section 10(b) and Rule 10b-5 will be imputed if, after the duty to inquiry arises, the investor does indeed inquire. The Appellants argue that because they actually inquired further after December 1997, we cannot deem them to have "discovered" Andersen's fraud until December 1998, when their further investigation uncovered facts of Andersen's scienter, such as the PC Data reports on GT's sales. The Appellants primarily rely on case law from the Seventh Circuit that inquiry notice does not exist "unless and until the investor is able, with the exercise of reasonable diligence (whether or not reasonably exercised), to ascertain the information to file suit," Marks v. CDW Computer Centers, Inc., 122 F.3d 363, 368 (7th Cir. 1997).
 
 
 71
 In a variation on this standard, the Tenth Circuit has held that inquiry notice "triggers an investor's duty to exercise reasonable diligence," but the limitations period does not begin to run until "the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." Sterlin v. Biomune Systems, 154 F.3d 1191, 1201 (10th Cir. 1998); see also Howard v. Haddad, 962 F.2d 328, 330 (4th Cir. 1992) ("The one year discovery limitations period thus began running either when [plaintiff] had notice of these facts or when, exercising reasonable diligence, he would have discovered them."); cf. Berry v. Valence Technology, Inc., 175 F.3d 699, 705 (9th Cir. 1999) ("If we were to adopt inquiry notice, we would agree with the Tenth Circuit's formulation of the standard [in Sterlin]."). The Tenth Circuit reasoned that "the applicable statute of limitations should not precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims." Sterlin, 154 F.3d at 1202.
 
 
 72
 Our precedent points in this direction. In discussing Ceres, our precursor to Lampf, we stated that Ceres "announced a uniform limitations period of the earlier of one year from the date the fraud was or reasonably should have been discovered or three years from the date of the transaction." Henley v. Slone, 961 F.2d 23, 24 (2d Cir. 1992) (emphasis added). In Dodds, we explained, "A plaintiff in a federal securities case will be deemed to have discovered fraud for the purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." 12 F.3d at 350 (emphasis added).
 
 
 73
 In accordance with Sterlin and our own precedent, we conclude that whether the Appellants' claim against Andersen is time-barred turns on when, after obtaining inquiry notice in December 1997, the Appellants, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud by Andersen.[1] Andersen faults the Appellants for taking a year to obtain the PC Data sales reports, arguing that the information in those reports was publicly available. Indeed, the Appellants alleged in the Complaint that PC Data publishes "a comprehensive, monthly report that tracks the sales of video game hardware and software of top retailers in the United States." The Appellants counter that the PC Data report on which they rely contains information that was customized for them, costly to obtain, and "not readily accessible" to the public. Brief for Appellants at 56 n.27.
 
 
 74
 Because we are, on a motion to dismiss, limited to the facts contained in, or incorporated into, the complaint, we cannot rule as a matter of law that the Appellants had constructive notice of the sales figures in the PC Data Report before December 1998. See Dodds, 12 F.3d at 352 n.3. For the same reason, we cannot determine, as a matter of law, the point in time after December 1997 that the Appellants, in the exercise of reasonable diligence, should have discovered the facts underlying their fraud claim against Andersen. Therefore, if the claim against Andersen otherwise survives this motion to dismiss, we would remand this issue to the District Court for appropriate fact-finding.
 
 B. Scienter
 
 75
 To state a claim against Andersen under section 10(b) and Rule 10b-5, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. 78u-4(b)(2). The District Court dismissed the claim against Andersen because the Appellants "offer no evidence" to support a strong inference of Andersen's scienter, Herzog, 1999 WL 1072500, at *11. Although the Complaint alleged that Andersen had violated various GAAP provisions, those allegations, "without corresponding fraudulent intent," do not suffice to state a securities fraud claim." Chill, 101 F.3d at 270.
 
 
 76
 The Appellants argue that Andersen had the requisite scienter because it willfully or recklessly disregarded GT product sales data, which allegedly made clear that GT would not likely recoup its royalty advances. For "recklessness on the part of a non-fiduciary accountant" to satisfy securities fraud scienter, "such recklessness must be conduct that is 'highly unreasonable', representing 'an extreme departure from the standards of ordinary care.' It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 120-21 (2d Cir. 1982) (citations omitted); see McLean v. Alexander, 599 F.2d 1190, 1198 (3d Cir. 1979) (scienter can be established by a "showing of shoddy accounting practices amounting at best to a 'pretended audit,' or of grounds supporting a representation 'so flimsy as to lead to the conclusion that there was no genuine belief back of it'") (footnotes omitted).
 
 
 77
 We conclude that the PC Data report on GT's sales does not by itself indicate that it was unlikely that GT would recover its royalty advances from future sales. As to GT, we concluded that such data did support scienter, but only when coupled with, among other things, the alleged fact that most of GT's sales of a product occur within the first year of the product's release. The Complaint, however, does not allege facts from which to reasonably infer that Andersen knew that most of GT's sales of a product occur within a year of the product's release. This knowledge cannot be reasonably inferred from the allegation that Andersen had been GT's outside auditor since some time prior to 1995. The Appellants have insufficiently pled facts supporting a strong inference of Andersen's scienter.
 
 Conclusion
 
 78
 For the reasons stated above, we affirm the judgment to the extent that it dismissed the claim against Andersen, reverse the judgment to the extent that it dismissed the claims against GT and its officers, and remand for further proceedings. Mindful of the burdens that broad discovery sometimes unwarrantedly impose on Rule 10b-5 defendants, we invite the District Court to consider limiting the Appellants' initial discovery to the subject of GT's product-by-product (a) sales and (b) quarterly expensing of royalty advances. The result of discovery on this subject might either justify broader discovery, if the Appellants' allegations are borne out, or make the case appropriate for summary judgment, if they are not.
 
 
 
 Notes:
 
 
 [1]
 This inquiry should not be confused with equitable tolling, which does not apply to section 9(e) of the Exchange Act. "The 1-year period, by its terms, begins after discovery of the facts constituting the violation, making [equitable] tolling unnecessary," Lampf, 501 U.S. at 363. Moreover, equitable tolling does not apply to the three year period in section 9(e) because that provision "serves as a cutoff." Id. at 363. To be sure, in Dodds we stated, "Equitable tolling will stay the running of the statute of limitations only so long as the plaintiff has exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." 12 F.3d at 350 (internal quotation marks omitted). In that case, however, we considered not only section 9(e) of the Exchange Act but also section 13 of the Securities Act of 1933, 15 U.S.C. 77m, which lacks a cutoff period. See id. at 349-50 & nn. 1-2.